## Spencer Griffin *v.* His Creditors.

Where a creditor whose debt is actually due, gives time to his debtor, taking a note payable at a future period, but stipulating that on failure by the latter to pay at the maturity of the note, he shall pay the highest conventional interest from the date of the note till paid, the agreement is legal. In such a case the creditor will be presumed to have remitted the interest he had a right to exact for the credit allowed, and the debtor, on failing to take up the note at maturity, will only pay the conventional interest allowed by law. Otherwise, where such a stipulation is contained in a note given for the price of property sold on a credit. In this case it must be presumed that the price was proportioned to the length of credit, and paid not only for the property, but for its use from the sale to the stipulated time of payment, and that any penalty or damages agreed on, though in the form of interest, must have been for the purchaser's default or delay in paying, which is usurious and illegal. To enforce such an agreement, would be to compel the purchaser to pay

Griffin v. His Creditors.

the amount of the interest between the date and maturity of the note, in addition to the highest conventional interest from the latter period, thus condemning him to pay as a penalty, or as damages for the inexecution of an obligation to pay money more than the highest rate of conventional interest, which, whatever be the shape of the contract, the law forbids. C. C. 1925, 2895.

Where the object of a contract is anything but the payment of money, the parties may determine the sum that shall be paid as damages for its breach, and the courts will lend their aid to carry the agreement into effect. C. C. 1928. *Aliter*, where the contract is to pay a sum of money. In such a case, no damages exceeding the highest rate of interest allowed by law, can be stipulated. The damages due for delay in the performance of an obligation to pay money, are called interest. The creditor is entitled to such damages, without proving any loss ; and he can recover no more, no matter what loss he may have sustained. C. C. 1929.

In ordinary partnerships, each partner is only bound for his share of the partnership debts, to be calculated in proportion to the number of partners, and without reference to the portions of the stock or profits to which each may be entitled. C. C. 2844.

Where a creditor becomes the purchaser of property sold at her instance at a Sheriff's sale, subject to her mortgage and privilege as vendor, the debt secured by such mortgage and privilege is, *pro tanto*, extinguished by confusion. She cannot claim to have the price bid by her imputed to another debt, so as to affect the rights of other creditors.

The rules laid down by the Civil Code, art. 2162, relative to the imputation of payments where two debts are of the same nature and equally onerous, apply to settlements between debtor and creditor ; they cannot be enforced to the prejudice of third persons.

APPEAL from the District Court of Rapides, *King*, J.

*Brent* and *O. N. Ogden*, for the appellants, Lambeth & Thompson.

*Brewer*, for the appellant, D. M. Cotton, and for V. F. Cotton and D. H. Stokes.

*Dunbar*, *Hyams* and *Elgee*, for Wm. Stokes.

*Evans*, for E. A. Wilder.

MORPHY, J. In a tableau of distribution filed in this case, Lambeth & Thompson were set down as privileged creditors on certain slaves, as the holders of a note for $1966 66⅔, dated the 8th of February, 1836, and made payable three years thereafter, with interest at ten per cent per annum from its date, if not punctually paid at maturity. They were besides put down as judgment creditors for $4855 98. D. A. and W. A. Stokes, were ranked as mortgage creditors for $4294 81, and Mrs. E. A. Wilder, for a balance of $7610, due her on a judgment. A number

of oppositions were made to this tableau, some of which only it will be necessary to notice in this court.

Diey M., the wife of Valentine F. Cotton, but separated in property from him, opposed the claim of Lambeth & Thompson, as holders of the note for $1966 66⅔, alleging that said debt is wrongfully placed on the tableau in their name; that she is the legal and *bona fide* proprietor of said note, having received it, with other notes, for her portion, in the partition of her father's, Joseph Brown's, succession; that she never parted with her interest in said note, and that it was recognized and declared to be her paraphernal property, in a judgment of separation which she obtained against her husband. She prays to be placed on the tableau in lieu of Lambeth & Thompson, as a creditor of the insolvent, for this note, and the interest due thereon.

Valentine F. Cotton joined in the opposition of his wife, averring, in substance, that the note for $1966 66⅔ was, with sundry others, transferred, or delivered by him to Lambeth & Thompson, at a time when he owed them nothing; that it was understood that this transfer was made as collateral security for any advances they might make for him; that they subsequently made some small advances for Griffin & Cotton, who were ordinary planters, but that the amount thus advanced, so far as he was indebted for it, was more than paid by the other notes received and collected by Lambeth & Thompson, and by the sale of a crop of cotton shipped to them by Griffin & Cotton, which they sold, and of which they received the proceeds; that he owes them nothing, and has never at any time been in their debt; but that, on the contrary, they are largely indebted to him, &c. He prays that his wife's opposition may be sustained, and the note for $1966 66⅔ placed on the tableau as her property.

Mrs. E. A. Wilder maintains in her opposition, that the balance of $7610, for which she is set down on the tableau, should take precedence of, and be paid before, any other debt, it being due upon property acquired by the insolvent from her first husband, Anthony Griffin, and now surrendered to his creditors.

Lambeth & Thompson opposed most of the claims on the tableau, and specially that of the Stokes, which they prayed might be rejected.

On the trial of these oppositions, the Judge below dismissed the opposition of Diey M. Cotton, and of her husband, V. F. Cotton, and gave judgment in favor of Lambeth & Thompson for the note of $1966 66⅔, but only with five per cent interest thereon from the date of the protest, with the vendor's privilege on certain slaves, in part payment for which, it had been given.   He allowed the claim of Wm. Stokes for $1749 37, and that of David Stokes for $1277 11, with five per cent interest on their respective amounts from the 2d of September, 1841, and with legal mortgage upon the property of their former tutor from the 10th of May, 1834, but to take effect upon the slaves subject to the special mortgage of Lambeth & Thompson, only after they shall be paid. The Judge finally gave judgment in favor of Mrs. E. A. Wilder, for $6028, with ten per cent interest per annum, from the 2d of August, 1841, but with a privilege on the slaves included in the sale made by her husband to the insolvent, only for $1053, and with a mortgage for the balance, to wit, $4975, to be exercised after the special mortgage of Lambeth & Thompson, and the legal mortgage of the Stokes.

From this judgment, Lambeth & Thompson, and Diey M. Cotton have appealed.    E. A. Wilder, in her answer to the appeal, prays that the judgment below may be so amended as to allow her the whole amount of her claim, instead of $1053 only, out of the proceeds of the slaves sold by her husband Anthony Griffin.

Lambeth & Thompson complain, that the Judge allowed them only five per cent interest on the note of $1966 66⅔, from the date of protest, when the note, upon its face, calls for interest at ten per cent per annum, from its date, if not paid at maturity.   They aver, that the stipulation which this note contains, is perfectly legal, and is not usurious.    They refer us to two decisions of this court, to be found in 8 Mart. 716, and 1 Robinson, 130.   In the latter case, the defendant was relieved from the penalty, because no demand was made on the maker of the note, at its maturity ; but the legality of the penalty does not appear to have been questioned, and formed no point in the case.   From the report of the other decision, the note does not appear to have been given for property bought on credit.   The debt was probably one actually due, when the note was made.   The creditor who, voluntarily,

and without receiving any consideration, gives time to his debtor, may well be considered as having remitted the interest which he had a right to exact for the credit allowed. In such a case, the condition, or agreement, that on the debtor's failure to pay at maturity, he shall pay ten per cent interest from the date of the note, is perfectly legal, and the promissor is bound by it. The money was *debitum in præsenti, solvendum in futuro.* He in truth pays only ten per cent per annum for the use of the money. But the present case is widely different from that.

The record shows, that this note was given for the third instalment of certain slaves, sold at the probate sale of the estate of Joseph Brown, and bought by the insolvent on a credit of one, two, and three years. Until the expiration of these terms of credit, the purchaser owed nothing. The price he agreed to give for these slaves, must be presumed to have been, and no doubt was, proportioned to the length of credit announced at the public sale. It, therefore, paid not only for the property purchased, but also for its use and enjoyment from the day of the sale up to the stipulated time of payment. Civil Code, arts. 2047, 2048, 2049. Pothier, Vente, No. 286, p. 169.

If, then, any penalty or damages were agreed on, it must necessarily have been entirely for the purchaser's default or delay to pay the money. There is, in our law, a marked difference between the damages which may be stipulated for the breach of an obligation to pay money, and an obligation to give a thing or perform an act. Where the object of a contract is anything but the payment of money, the parties may determine the sum that shall be paid as damages for its breach, and courts of justice will not interfere with such agreements ; but, on the contrary, will lend their aid to carry them into effect. Civil Code, art. 1928. But it is otherwise, when the contract is to pay a sum of money. The law has provided, that no damages exceeding ten per cent on the amount that was to be paid, can be stipulated. Article 1929 of the Civil Code declares, that " the damages due for delay in the performance of an obligation to pay money, are called interest. The creditor is entitled to these damages without proving any loss ; and whatever loss he may have suffered, he can recover no more. Article 2895 of the same Code, provides, that " interest is legal or con-

ventional ; if conventional, it cannot exceed ten per cent." Any contract, or agreement, therefore, into whatever shape it may be thrown, which stipulates for more than ten per cent damages, or interest, for the delay to pay money, is illegal. 1 Pothier, Oblig. No. 170.    6 Toullier, No. 266 and No. 809.    If, in the present instance, the penalty was enforced, the purchaser would be made to pay, for the three years elapsed, thirty per cent over and above the interest of ten per cent, which has been running from the date of the protest.    This penalty, or these damages, (the name is unimportant,) would clearly be awarded for the inexecution of an obligation to pay money.    As the law forbids that such damages shall exceed ten per cent per annum, on the amount of money which the debtor has bound himself to pay, the inferior Judge acted correctly, in our opinion, in refusing to carry such a stipulation into effect, and in allowing only legal interest, pursuant to article 1933 of the Civil Code.

Our attention has next been called to the opposition of Mrs. Cotton, and that of her husband, Valentine F. Cotton.    The evidence shows, that the note of $1966 66$\frac{2}{3}$, which they claim, fell, with other notes, into the lot or share of Diey M. Cotton, at a partition of the estate of her father, made on the 20th of April, 1836.    This note, together with several others, was deposited by Cotton to his own credit, in the Bank of Louisiana at Alexandria, and, on the 29th of February, 1837, they were ordered, by a letter of Cotton to the Cashier, to be thereafter held for the account of Lambeth & Thompson.    Some of these notes were paid, and the proceeds given to them.    They also received those which remained unpaid. It is not shown that any consideration was at that time given for these notes by Lambeth & Thompson, nor that Valentine F. Cotton was then in any way indebted to them.    He alleges in his opposition, and it has not been denied, that the notes were delivered to them, by his order, as collateral security for any advances they might make to him thereafter.    From an account current which we find on the record, signed by Lambeth & Thompson, on the 16th of November, 1839, they appear to have made advances to Griffin & Cotton, then associated as partners in the business of planting and cultivating cotton, to the amount of $14,025 57, between the 13th of June, 1838, and the 12th of January, 1839.    The

account is credited with $4583 31, as the proceeds of the notes given to Lambeth & Thompson in 1837, and with $5214 84, as the proceeds of cotton shipped to them by Griffin & Cotton; and it is stated at the foot of the account that they held the note of $1966 66⅔, then under protest. It is urged by the opponent, V. F. Cotton, that the amount of these notes received by Lambeth & Thompson, added to one-half of the proceeds of the cotton, over-pays the portion of the advances to Griffin & Cotton, for which he, as an ordinary partner, could be made liable, to wit, $7012 78½; that his debt to them being thus paid, they have no right to retain this note of $1966 66⅔, which is his individual property, and to apply it to the debt of Griffin, his former partner. We think that this opposition should have been sustained. Had no payment whatever been made by the partners Griffin & Cotton, it is clear that Lambeth & Thompson could not have recovered from each partner more than one-half of the debt. Civil Code, art. 2844. They received these notes with the knowledge that they were the separate and individual property of Cotton, long before any advances were made to the partnership he subsequently formed with Griffin. They could not apply them without Cotton's consent, to the debt due by his partner. It is urged, that commission merchants who do the business of partners of this kind, keep but one account, and credit it with whatever cash payments are made by either of the partners; that such payments must be presumed to be made on joint account; and that negotiable paper cannot be placed on a different footing. This may be, and we believe is true, in relation to payments made by the partners during the partnership, and in the ordinary course of remittances; but, in the present case, Lambeth & Thompson had had previously possession of this note, and had held it as the separate property of Cotton, who they knew was liable only for his half of the partnership debt; they could not, therefore, without his express consent, apply it to the debt of another person.

The facts in relation to the claim of Mrs. Wilder, are these. On the 23d of November, 1836, she obtained, against the insolvent, a judgment for $5500, a balance yet due to her as the purchase money of a plantation and some slaves, sold to him by her husband, Anthony Griffin, on the 23d of February, 1835, with inte-

rest at ten per cent per annum from the 1st of January, 1835, on certain notes forming this amount. The judgment allowed her, moreover, the sum of $10,000, with ten per cent interest per annum from its date, until final payment. On the same day she entered into a settlement, or compromise, in which, among other things, she allowed him on the $5500, a credit of $641 50, and on the debt of $10,000, another credit of $3500, and for the balance of $6500, she received four notes of $1625 each, payable at one, two, three, and four years, bearing ten per cent interest. To secure the payment of the five remaining notes given in 1835, and the four notes of $1625 each, the insolvent executed a mortgage to her on the land he had purchased from her husband, and on a certain number of slaves. Two of the notes of $1625 not having been paid at maturity, she sued out an order of seizure and sale against the land and slaves. A sale of the land and of two of the slaves took place, on the 2d of August, 1841, under her writ, and another writ of Wolf, Bishop & Co., as holders of one of the notes of $1625. At this sale, Mrs. E. A. Wilder became herself the purchaser of the land subject to her vendor's privilege, and of the two slaves mortgaged to her, with others, on the 23d of November, 1836. The property was adjudicated to her for nine thousand eight hundred and ninety-five dollars. On calculating up to the day of the Sheriff's sale the interest due on the remaining notes given for the land in 1835, we find that the balance of the price then due to Mrs. Wilder, amounted to $8268 04. The Judge, it appears, applied to the payment of this balance, $7215 04, the amount of her bid for the land, after deducting a previous mortgage in favor of the City Bank, thus leaving unpaid the $1053, for which only he allowed to her a vendor's privilege on the slaves sold, together with the land, by Anthony Griffin. As to the proceeds of the slaves Adam and Levi, he imputed the amount to the remaining notes of $1625, secured by the mortgage on these slaves, and others in November, 1836. This left a balance due Mrs. Wilder, of $4975, for which she complains that the judgment disallows her a privilege on the remaining slaves, sold by her husband to the insolvent, in 1835. The Judge below did not err. Mrs. Wilder having became the purchaser of the land, subject to her vendor's privilege, bearing

date the 23d of February, 1835, and to her mortgage claim under the settlement of the 23d of November, 1836, these debts were extinguished by confusion, in the same manner, and in the same order as if another person had bought the property, and the price had been applied to the payment of these two debts. Civil Code, art 2214. Code of Practice, art. 708. 3 La. 212. It is said that, as she had a mortgage on the land and the slaves, and the sale was made at her suit on the two notes of $1625, the money brought by the land should not have been imputed exclusively to her privileged debt, but that the most legal and equitable mode of applying it would have been to impute it to the whole debt of Mrs. Wilder, without any distinction ; and we are referred to the rules laid down in the code for the imputation of payments, when two debts are of the same nature, and equally onerous. Civil Code, art. 2162. These rules, which are to govern in the settlement of accounts between a debtor and his creditor, cannot clearly be enforced to the prejudice of third persons. As soon as the insolvent, who became the tutor of Wm. and David Stokes, on the 10th of May, 1834, bought of Anthony Griffin the land and slaves, in 1835, their legal mortgage attached to the property, subject only to the vendor's privilege for the price. The moment this was paid, their mortgage necessarily took effect, and has precedence of that of Mrs. Wilder, derived from the settlement of November, 1836. The effect of the imputation contended for, would be, to postpone their mortgage to hers on the slaves sold to the insolvent, by Anthony Griffin. The Judge, therefore, was right, in allowing her a priority on the proceeds of the slaves only, for the balance of the price, to wit, $1053.

As to the amount allowed to William and David Stokes by the judgment, we have examined the evidence, and can find nothing in it which authorizes us to say, that it has been erroneously decreed to them.

It is, therefore, ordered, that the judgment of the District Court be so amended as to substitute Mrs. Diey M. Cotton in place of Lambeth & Thompson, as the owner of the note of $1966 66⅔, mentioned in the tableau ; and that the judgment be affirmed in all other respects ; the costs of this court to be borne by the appellants Lambeth & Thompson.

SAME CASE—APPLICATION FOR A RE-HEARING.

The rule *stare decisis* is entitled to great weight and respect, where there has been
on any point of law a series of adjudications, all to the same effect; but a sin-
gle decision, believed to have been unadvisedly or erroneously made, will be over-
ruled.

*Brent* and *O. N. Ogden*, for Lambeth & Thompson, prayed
for a re-hearing on the ground, that the court erred, in deciding
the note for $1966 66⅔, to be the property of D. M. Cotton, and
in sustaining the decision of the lower court refusing to allow in-
terest from the date of the note. The decision as to the illegality
of such stipulations must affect existing contracts to a great
amount. The practice of taking notes for the price of property
sold on credit, with the condition that they should bear interest
at ten per cent from date, if not paid at maturity, originated more
than twenty years since, under the sanction of this court. Such
notes have been repeatedly sued upon, and their amounts, with
the interest so stipulated, recovered. Many cases have been
brought up to this court, with evidence establishing a sale on cre-
dit, and the judgments of the lower courts for the principal and
interest have been invariably affirmed. If the legal question of
the validity of such stipulations has not been raised, it was be-
cause the decision in *Lauderdale* v. *Gardner*, 8 Mart. 716, de-
cided in 1820, was regarded as having settled the question. The
court say, that the note sued on in the case of *Lauderdale* v.
*Gardner*, "does not appear to have been given for property
bought on a credit." From an examination of the original record
in that case, it will be found, that the note was given for the price
of two negroes, and that the note itself, which was in evidence,
expressed the consideration. It was for $1600, payable at twelve
months, not at two months as stated in the report, with a condi-
tion, that it should bear "interest from date, if not punctually
paid, at ten per centum per annum." The District Judge re-
fused to allow interest except from the maturity of the note, and
this refusal was assigned as error, in express terms, in the peti-

tion of appeal itself.   With the question thus directly before them, this court reversed the judgment of the lower court, and rendered one for the amount of the note, with interest at ten per cent from its date.   The case so decided, and the one now before the court, are identical.   The rule *stare decisis* should be particularly adhered to in a case like this, where it is of infinitely less importance. how the law is settled, than that it should be settled.

Although the Civil Code, art. 1929, speaks of interest as " the damages due for delay in the performance of an obligation to pay money," it is perfectly clear, that a note may be taken, either for property sold on a credit, or for an existing debt, with interest from its date, without being usurious.   Had the note in suit stipulated for interest at ten per cent absolutely from its date, the debtor would not have been *in morâ*, until after its maturity.   Such a note would only differ from the one sued on, in this, that in the latter a condition was inserted favorable to the debtor, the performance of which was optional with him, and which if performed would have exonerated him entirely from the payment of any interest whatever.   Can such a condition be construed to make a contract usurious, which, without it, would have been binding and legal ?   Will not a creditor who loses his money by such a process of reasoning, consider himself a victim to one of those hard constructions and strained inferences, of which Lord Bacon says, that wise Judges should beware ?   Much importance has been attached to the fact, that by the published terms of the sale, it was to be on a credit of one, two, and three years.   On this fact the decision of the court seems to have been entirely based.   It is argued, that in consideration of this extended credit, the purchaser paid more for the property than he would otherwise have done—that he paid for the time, in the enhanced price.   But the court should also have inferred, that the purchaser likewise took into consideration, that, on failure to pay at maturity, he would be responsible for interest from the day of sale.   If the credit operated to enhance, the penalty tended to diminish the price.

By the English law, which is extremely rigid against usury, which vacates the contract entirely, and renders the taking of more than legal interest an indictable offence, it is not considered

usurious to stipulate for even a higher rate of interest than that allowed by law, where the debtor is permitted to discharge both the interest and principal, by paying the latter at the time fixed on. 7 Bacon's Abridgment, 190, *et seq*. Chitty on Contracts, and Hawkins' Pleas of the Crown.

As to the ownership of the note: The court say, that D. M. Cotton alleged, that the note was received by the appellants, Lambeth & Thompson, as collateral security for future advances, and that this has not been denied by them. No inference unfavorable to Lambeth & Thompson should be drawn from this circumstance, as they could not have denied this allegation. To have done so would have been in the nature of a replication, not allowed by our practice. The note, whether given as a payment, or to secure future advances, was a negotiable instrument, transferred before maturity, which Lambeth & Thompson received as so much money. If V. F. Cotton chose to pay, both for himself and his partner, he cannot recover back what he has so paid. Had he not volunteered the payment, Lambeth & Thompson might have secured from his partner, the share for which he was responsible to them. Cotton's wife has no more right than her husband to claim the note. There was nothing on it to show her title. It was endorsed in blank, and in the possession of the husband.

MORPHY, J. A re-hearing is prayed for in this case. No new arguments, or authorities, have been adduced, in relation to the question of *back interest*, (as it is called,) but the rule *stare decisis*, has been pressed upon us with zeal and ability. The counsel has shown, by the original record of the suit of *Lauderdale* v. *Gardner*, that the facts in that case were different from what we supposed they were, from the imperfect and incorrect report of it found in 8 Mart. 716. The note sued on apears to have been given in that, as in the present case, in payment for slaves sold on credit; but the question of usury was not even raised by the pleadings in the inferior court. The only defence set up in the answer was, that the defendant, Sarah Gardner, having renounced the community existing between her and her late husband, was not liable for its debts. The point in relation to the stipulation of back interest, seems, however, to have been made in the argu-

ment in the appellate court, as we find that in deciding the case, the court express their opinion on the legality of such a covenant, although they do not state as fully, as could be desired, the grounds on which it was contested. It is evident, from the manner in which the question was disposed of, that the point was not fully developed, as it has been on the present occasion. The case was, moreover, decided under the Code of 1808, which in its provisions is far from being as explicit on the subject, as that of 1825. Had the question occurred under the latter Code, and had it been then presented to the court in the same light as it has been to us, it is doubtful whether they would have come to the same conclusion. But be this as it may, this decision is the only one in our reports in which the point appears to have been at all considered. In the two other cases referred to by the counsel, that of *Glover* v. *Doty*, and that of *Hooper and Thomas* v. *Hyams, Executor*, the point was passed *sub silentio*. We cannot consider the case in 8 Martin, as so settling our jurisprudence on this subject, as to make it our duty to surrender to it our deliberate opinion on this question. The rule *stare decisis*, is entitled to great weight and respect, when there has been on a point of law, a series of adjudications all to the same effect; but when we are presented with a single decision, which we believe to have been unadvisedly made, it is incumbent on us to overrule it, if we entertain a different opinion on the question submitted. As to the stress laid on the circumstance, that in the section of country from which this appeal has come, the practice has long and universally obtained under that decision, of taking notes for the price of property sold on credit, conditioned to bear interest at ten per cent per annum from date, if not paid at maturity, we have only to say, that the sooner a stop is put to such a practice, the better. It is no great hardship, that the parties making such contracts should be restricted to the highest rate of conventional interest allowed by law, for any delay they may experience in the collection of their debts. Even for the sake of preserving our consistency, (so earnestly recommended to us,) we cannot believe ourselves justifiable in allowing, over and above such interest, a penalty or damages amounting, in this instance, to thirty per cent of the instalment claimed, and in some instances, as we under-

stand, to fifty per cent on the debts due. On the illegality of such a stipulation, we can not entertain a doubt. Conventional interest, whether it is stipulated *eo nomine*, or in the shape of a penalty for the default, or delay in the performance of an obligation to pay money, can not exceed ten per cent per annum, on the amount due, Civil Code, arts. 1929, 2121, 2395. There is no difference between stipulating a higher rate of interest than ten per cent per annum, for the delay, and stipulating only ten per cent, but to be calculated on a longer time than the delay which has occurred, or may really occur. In the present case, nothing was due before the maturity of the note sued on. Had the drawer then paid it, nothing in the shape of interest could have been claimed of him. If the holder is entitled to any, it is clearly due *ex mora*, and cannot exceed ten per cent per annum, for the time that the payment of the capital has been delayed. In a sale on credit, the price the purchaser agrees to give, is larger in proportion to the credit given, and pays not only for the property, but for its use and enjoyment between the day of the sale and the stipulated time of payment ; therefore, any interest that might be stipulated to run during that interval, forms no part of the price, and can be viewed in no other light than as a penalty for the delay, or default to pay such price. But it is urged, that if, by the published terms of the sale, the extended credit was announced to the people, it was also made known to them, that they would have to give notes bearing interest at ten per cent from date, if not paid at maturity ; that if, on the one side, the long credit operated upon the minds of the purchasers to increase the price, the danger of having to pay *back interest* must, on the other side, have operated to its diminution. Admitting this to be true, does it in any way render such a stipulation more legal ? If, instead of such back interest at ten per cent, the published terms of the sale had announced that the notes, in case of non-payment, should bear twenty per cent from their maturity, would the announcement of such a stipulation render it less usurious ? Could it be pretended that, because the purchaser had it in his power to relieve himself from such interest by paying the principal at the time fixed, there was no usury, and that the stipulation should be enforced ? Could it be said, that as he had so made his contract, he should

be bound by it? A purchaser, under such circumstances, may well flatter himself, that he will be able to pay the price, which he considers moderate by reason of the credit allowed, and that he will not incur the penalty. The law protects contracting parties against their own imprudence and folly in such a case ; and a stipulation, usurious in itself, cannot be rendered legal by the inconsiderate consent that may have been given to it, at the time of the contract. 6 Duranton, No. 488.

In relation to the ownership of the note of $1966 66⅔, we have no reason to be dissatisfied with the conclusion to which we came.

*Re-hearing refused.*