HIGGINS, Justice.
 

 This is an action of boundary by a riparian or littoral owner, claiming through mesne conveyances, particularly one dated November 30, 1917, and a patent issued by the State of Louisiana to one of his predecessors in title dated May 24, 1883, against the State, seeking to be decreed the owner of an eroded area which now forms a part of the bed of Grand Lake in Cameron parish, La.
 

 The defenses are that the State owns the disputed inundated area under either one or both of two distinct rules or principles of law:
 

 1. That the property forms a part of the bottom or bed of a navigable lake, which
 
 *789
 
 was such when Louisiana was admitted into the Union in 1812, and is therefore owned by the State by virtue of its inherent rights of sovereignty, and thus insusceptible of private ownership under articles 450 and 453 of the Revised Civil Code found in Book 2, title 1, “Of Things, and of the Different Modifications of Ownership.”
 

 2. That the State acquired title to the disputed area under the law of accretion, dereliction, and reliction, as set forth in articles 509 and 510 of the Revised Civil Code, found in book 2, title 2, chapter 3, dealing with “the right of accession to what unites or incorporates itself to the thing,” because Grand Lake is a navigable body of running water and was such in 1812, when Louisiana was admitted to statehood.
 

 There was judgment in favor of the State, and plaintiff has appealed.
 

 The district judge has so clearly stated the issues, the facts, and the law pertinent thereto, we quote approvingly, in part from his written opinion:
 

 “Plaintiff, the Miami Corporation, alleges that it is the owner of certain lands in Cameron Parish, Louisiana, its title originating in a patent issued by the State of Louisiana to Jabez B. Watkins, said patent being dated May 24, 1883.
 

 “Plaintiff alleges that the said lands were not surveyed at the time of the issuance of the patent, but the boundary is fixed by the shore line of Grand Lake as of date May 24, 1883. This line has been fixed by agreement, and is shown on the plat attached to plaintiff’s petition, designated as ‘Bank Line 1883 — Computed.’
 

 “Plaintiff further alleges that the shore line has receded eastward until at present a large part of several of the original sections of land is inundated and permanently covered by the waters of the lake.
 

 “Relying on the rule established in the case of State v. Erwin, 173 La. 507, 138 So. 84, plaintiff prays that the boundary of its property in Sections 3, 4, and 9 of Township 14 South, Range 3 West, be established along the shore line as it was on May 24, 1883, and that plaintiff be decreed the owner of all the area east of the said line, whether inundated or not, and the State be- decreed the owner of all the area west of said line whether inundated or not.
 

 “Defendant admits plaintiff’s title as alleged, and by agreement fixes the shore line of the Lake, as of date May 24, 1883, as shown on the plat attached to plaintiff’s petition marked ‘Bank Line 1883— Computed.’
 

 “Defendant denies that the receding of the shore is due entirely to erosion, but alleges it is due in part to subsidence and other natural causes. Defendant alleges that, since Grand Lake is a navigable body of water, the bed of the lake is not subject to private ownership, and prays that the boundary of the land in question be - fixed at the shore line (or high water line) as of this date, which line was determined by an actual survey made during the month of March, 1933, and which line' is shown
 
 *791
 
 on the plat attached to plaintiff’s petition and designated ‘Shore line March 1933.’
 

 “Facts. The record in this case is made up of geological reports, maps, surveys, agreed statements of fact and some oral testimony.
 

 “From the record the Court finds the following facts: Grand Lake and the Mermentau River are navigable, and were navigable in 1812. Grand Lake is a body of water in Cameron Parish, Louisiana, approximately ten miles long from North to South, and from three to nine miles wide from east to west. The Mermentau River, flowing generally in a north to south-direction, flows into the north end of the lake and out of the south end. The south end of the lake, by' river, is 27 miles from the Gulf of Mexico. The waters of the Lake are fresh to brackish, and are affected to some extent by the tides. The Mermentau River meanders through and across alternate areas of high ridges or cheniers and low marshy land, widening generally in the marsh areas and being confined within a comparatively narrow channel through the higher, harder areas.
 

 “Where the river widens in the Marshy areas, it is in each instance locally called a lake, and the river is made up of a chain of lakes, connected by a narrow channel.
 

 “The name ‘lake’ is applied to various wide places in the river, some of which are widened to so little extent that the widening is scarcely perceptible. Such wide places in the river are: Lake Arthur, considerably above, and Little Mud Lake, considerably below Grand Lake, both of which are shown in scale on the plats introduced in evidence. Grand Lake is the largest of these so-called lakes in the entire chain.
 

 “The evidence further conclusively shows that there is a current running through Grand Lake with sufficient force to carry the sediment brought into the north end of the lake by the river out the south end, and it is also of sufficient force to remove the earth as it is eroded from the banks, so that the depth of the lake is practically the same near the receding shore as it is in the middle of the lake. (See testimony of Howe & Russell.)
 

 “The recession of the shore is caused by a combination of natural forces and conditions. The area involved in this suit is the southeast side of the lake, at a point where the force of the waves, due to the prevailing winds, is probably the greatest. The current or currents in the lake must also be a considerable factor, as there are no flats or shoals formed in front of the receding area. All material eroded is carried out of the Lake, through the river and into the Gulf of Mexico. Another natural force which has to do with the recession of the banks is subsidence. The entire area of Cameron Parish is subsiding. The percentage of erosion or recession due to the waves, current, or subsidence is not and can not be determined by the court, they work jointly to accomplish the result.
 

 “Of the three natural forces which cause the encroachment in this case, it is agreed by the parties that the waves and currents are factors. There is a contest on the question of subsidence.
 

 
 *793
 
 “Plaintiff’s expert plausibly contends that the entire area is being gradually built up, while defendants’ experts, representing the opposite school of geological thought, just as plausibly maintain that there is a constant subsidence of the entire area.
 

 ' “After a study of the reports and the testimony of the experts, which contain their theories, findings of fact and conclusions, this Court is of the opinion that subsidence of the area is irrefutably established.
 

 “To the court’s lay mind in geological matters, the discovery of logs at depths of hundreds of feet below the present surface of the earth, as shown by the report of Howe and Russell, at pages 1 and 3; the evidence of drowned rivers, as shown by Howe and Russell at pages 6 and 8, and drowned trees as explained by Russell at pages 38 to 42 of the transcript of evidence; and the present position of the Indian Mounds as to water level, particularly Allegator Mound which is located in the immediate vicinity of the area involved in this suit, as shown in the report of Dr. Kniffen at pages 54 and 55 of the transcript of evidence, prove conclusively that the area is gradually subsiding and has been subsiding for thousands of years. The rate of subsidence is estimated at approximately 12 inches a century.
 

 “The law. Counsel on both sides have materially assisted the court by reviewing the case in oral argument and by filing able and exhaustive briefs.
 

 “Article 509 of the Civil Code treats of alluvion along navigable streams or rivers, and defines alluvion as ‘accretions, which are formed successively and imperceptibly.’ Article 510 of the Civil Code treats of alluvion and dereliction and provides that the owner of the shore which is encroached upon by running water cannot claim the land he has lost. This article uses the term ‘running water’ instead of river or stream.
 

 “Article 453 of the Civil Code lists as public things the beds of navigable rivers, as long as they are covered by water. Article 457 of the Civil Code defines the banks of a river or stream as that which contains it in its ordinary stage of high-water, temporary overflow not changing it.
 

 “From the facts, and the above articles of the Civil Code, if the bank encroached upon in this case were located on the Mermentau River instead of the Lake, all parties agree" the articles of the Code would clearly apply.
 

 “The articles quoted in reality make the riparian owner a party to an aleatory contract, in which the State as the owner of the bed of the stream is the other party, and which contract provides that in the event one party loses by the encroachment of the stream and the other gains, the loss is offset by the possibility of a reversal of the condition. Delachaise v. Maginnis, 44 La.Ann. 1043, 1048, 11 So. 715.
 

 “Webster defines ‘encroach’ as ‘to enter by gradual steps or stealth' into the possessions or rights of another, to trespass; intrude.’ To encroach upon then, from the above definition, means that the
 
 *795
 
 water advances upon or gradually covers the land. The definition contemplates not only that which is covered by the surface being w.ashed away, but that which is covered gradually by any other natural means. When the land thus encroached upon forms a part of the bed of a navigable stream it becomes, by virtue of article 453 of the Civil Code, the property of the State as a public thing, and the former owner is divested of title.
 

 “Counsel for plaintiff contends that because the land encroached upon in this case is located not upon the bank of the Mermentau River but upon the bank of the body of water called Grand Lake, through which the Mermentau River flows, the articles of the Civil Code above quoted do not apply, and the riparian owner on the lake is not a party to an aleatory contract such as we have described above. * * *
 

 “The Louisiana courts have repeatedly interpreted Article 453 of the Civil Code, and the Articles immediately preceding and following it, exactly as have the French courts interpreted the similar Articles of their Code. In other words, although Article 453 and the other Articles cited do not specifically mention navigable lakes among public things, the courts have included such lakes among public things, and have repeatedly held that if a lake is navigable in fact, and was navigable in fact as of date 1812, the bed of the lake is a public thing, and title is vested in the State. * * *
 

 “Beginning with Milne v. Girodeau, 12 La. 324, decided in 1838, and down to the day before the Erwin Case was decided, the courts have held that the beds of navigable lakes of any class were public things, and the property of the State. The last case decided on the day before the case of State v. Erwin was New Orleans Land Company v. Board of Levee Commissioners, 171 La. 718, 132 So. 121, 123, wherein the Supreme Court specifically held that ‘the water bottoms of both classes of lakes [salt water and inland fresh water, navigable] are owned by the state to the high-water mark.’
 

 “The case of State v. Erwin specifically overruled the case of New Orleans Land Company v. Board of Levee Commissioners, on this point. * * *
 

 “To apply the rule established in the Erwin Case, would be impracticable. A study of the plat attached to plaintiff’s petition clearly shows that there is no discernable point where the Mermentau River ceases to be a river and becomes a lake. A property owner whose property extended two miles up the river, and two miles along the lake — we use this merely as an illustration — would be subject to two rules of property. On the river he would be entitled to alluvion and on the lake he would not. In the event alluvion was formed on both the river shore and the lake shore, at some point the owner’s land would extend from where it is today, and beyond that point it would remain fixed. In the case of encroachment of both, which is the case here, up to a certain point the owner would lose the land covered by the water, and beyond that point he would retain it, and neither the owner nor any court could definitely fix the
 
 *797
 
 point of offset. From a practical standpoint, also, since both the lake and the river are navigable, the rule established by the Erwin Case, since Grand Lake is expanding in all directions, would eventually result in a public thing partially owned by the State and partially owned by private individuals. If individuals owned the lake bottom around the edge of Grand Lake, such individuals could prevent trespass. Beyond the point where the shore was in 1812, one using the lake, although navigable, would be a trespasser on private property, and the trespasser would have no right to use the bank which was not inundated, since it would not be the bank of a navigable public water.
 

 “Counsel contends that the case of State v. Erwin establishes a rule of property, and this court is bound by the rule.
 

 “We appreciate the work and consideration given the Erwin Case by the Supreme Court, and the counsel representing the various parties interested in that case. The case was decided by a divided court, and only after a rehearing was granted. * * *
 

 “It is true that the interpretation of the Codal Articles or Statutes by the appellate courts is given the greatest consideration in subsequent interpretations of the same Articles or Statutes, However, the Erwin Case, deciding the question under one Article of the Civil Code, reversed all former jurisprudence on a different Article of the Civil Code arid consequently this court, although ■ loath to do so, would, if the identical question were presented, disregard the Erwin Case and follow the line of decisions, prior thereto.”
 

 The learned trial judge also decided the case in favor of the State “on the theory that Grand Lake is a body of running water, and, therefore article S10 of the Civil Code applies.”
 

 Grand Lake, like Calcasieu Lake, was a navigable lake, when Louisiana was admitted to the Union in 1812. It was shown that Calcasieu Lake is situated about 7 or 8 miles from the Gulf of Mexico, while Grand Lake is about 27 miles from the Gulf. The Mermentau river enters Grand Lake on the north and flows out at the south end to the Gulf, just as the Calcasieu river enters Calcasieu Lake on the north and flows out of the south end to the Gulf. The district judge found that conditions surrounding Grand Lake and Calcasieu Lake “are similar, though not identical.”
 

 Counsel for the plaintiff contend that under the doctrine of State v. Erwin, 173 La. 507, 138 So. 84, the land in question belongs to the riparian owner, or plaintiff; that even though the decision of the court in that case is erroneous and was rendered by a divided court, the rule announced therein is binding on this court under the doctrine of stare decisis, because the decision established a rule of property; and that this is particularly true, because an interpretation of a statute enters into and forms a part of the contract under which the property is acquired.
 

 Counsel for the State argue that the rule announced in State v. Erwin, supra, is not binding on this court under the common-law doctrine of stare decisis or its
 
 *799
 
 rigorous application as establishing a rule of property, because this doctrine is, at most, accepted in Louisiana only in a modified form; that the decision in State v. Erwin became final on November 30, 1931; that it was rendered by a divided court; tliat it has not been followed to date in a single instance; and that 'it not only stands alone in the jurisprudence of Louisiana, but that it is contrary to a series of decisions which have formed a part of the jurisprudence of this state for nearly one hundred years.
 

 Counsel for the plaintiff counters by saying that in several cases dating back-fifty years, this court has held that articles 509 and 510 of the Civil Code, dealing with alluvion, dereliction, and reliction have no application to .fresh water, navigable lakes, and that these authorities were followed in the Erwin Case.
 

 It is a fact that the majority opinion in State v. Erwin was concurred in by four justices, while three dissented, assigning their reasons for doing so. The majority opinion expressly overruled the doctrine announced in the case of New Orleans Land Co. v. Board of Levee Commissioners of Orleans Levee District, 171 La. 718, 132 So. 121. As we understand and analyze the pertinent authorities which will hereafter appear, it is our view that the case of State v. Erwin is out of line with Louisiana jurisprudence on the subject of “lakes” and it has never been followed.
 

 The rule as to a single decision constituting a precedent to be followed in Louisiana is stated in Quaker Realty Co. v. Labasse, 131 La. 996, 60 So. 661, 665, Ann.Cas.1914A, 1073:
 

 “As thus broadly stated, the doctrine is counter to the decisions in the Duplantier [Reinach v. Duplantier, 46 La.Ann. 151, 15 So. 13] and Negrotto [Breaux v. Negrotto, 43 La.Ann. 426, 9 So. 502] Cases, supra, and cannot be justified, and must therefore be to that extent recalled or modified, and in that connection it must be remembered that only seldom can a single decision serve as a basis for stare decisis, and never where opposed to previous decisions, and especially where such previous decisions are overruled without being referred to, as if having escaped altogether the attention of the court.
 

 “
 
 ‘A
 
 single decision is not necessarily binding.’ 11 Cyc. 745. ‘More than one decision,’ said Judge Martin in Smith v. Smith, 13 La. 441, ‘is required to settle the jurisprudence on any given point or question of law.’ ‘We have often said,’ said this court in Lagrange v. Barré, 11 Rob. 302, ‘it requires more than one decision to establish a jurisprudence.’
 

 “And in Griffin v. His Creditors, 6 Rob. 216-224:
 

 “ ‘The rule of stare decisis is entitled to great weight and respect when thefe has been, on a point of law, a series of adjudications all to the same effect; but when we are presented with a single decision, which we believe to have been inadvisedly made, it is incumbent on us to overrule it, if we entertain a different opinion on the question submitted.’ ”
 

 We overruled two decisions quite recently when we concluded they were er
 
 *801
 
 roneous. Reeves v. Globe Indemnity Co., 185 La. 42, 168 So. 488, and In re Hibernia Bank & Trust Co. in Liq. (Pan American Life Ins. Co., Intervener), 185 La. 448, 169 So. 464. See, also, 26 Am. & Eng.Enc. of Law, 167, 168; Tulane Law Review, Vol. VII, No. 1, pp. 117, 118 (Dec. 1932); Black’s Interpretation of Laws (1896) 401, §§ 150, 151. There also appears an interesting discussion on this subject by Dr. Mitchell Franklin in the Louisiana State Bar Ass’n Reports (1933-1934), pp. 102, 103.
 

 Even in regard to the rules of property, the maxim of stare decisis is not absolutely inflexible. This is particularly true when it is shown that by following, rather than by disregarding previous erroneous decisions from which an evil resulted, the community would suffer greater damage. In such situations, the courts have overruled the prior cases, in order to correct the jurisprudence. In Louisiana, this court has never hesitated to overrule a line of decisions where they establish a rule of property when greater harm would result from perpetuating the error rather than from correcting.
 

 In the case of Watson v. Feibel, 139 La. 375, 71 So. 585, 588, the plaintiff sued to resolve a sale of realty, the defendant having been put in default under the provisions of article 1911 of the Louisiana Civil Code of 1870, on the day preceding the institution of the suit. After the plaintiff had entered a preliminary default, the defendant tendered full payment, including the costs of court. The tender was rejected by the plaintiff on the ground that the offer to perform had come too late, i. e., after defendant had been put in default. The judge of the district court rendered judgment in favor of the plaintiff, under the accepted doctrine of at least nine previous Supreme Court decisions extending over a period of over three-fourths of a century. This court unanimously annulled the decision and said:
 

 “Putting in default is not a thing invented by the framers of our Code. It was taken by them from the civil law. And it was thus taken in the same condition in which it was there found. Hence, in determining what is its nature and proper function we may in all safety go to that system as expounded by its courts and law-writers.”
 

 After an exhaustive survey of the French commentators, the court swept aside a long line of decisions relied upon by the plaintiff as a rule of property.
 

 In the case of Lepine v. Marrero, 116 La. 941, 41 So. 216, this court said:
 

 “Plaintiff’s home was seized as if still belonging to his vendor, although he held it by a cash deed duly recorded. The deed, however, was signed by the vendor alone; and upon that circumstance the seizing creditor relied in making his seizure. Plaintiff has enjoined the seizure; and the question presented is: Whether the recordation of a cash deed to real estate signed by the vendor alone will effect a registry of the sale as against third persons. Finding that this question had been decided in the negative by this court in the recent case of Hutchinson v. Rice, 109 La. 29, 33 So. 57, while the former juris
 
 *803
 
 prudence (Allen v. Whetstone, 35 La.Ann. 846, and cases there cited), seemed to be the other way, the Court of Appeal for the parish of .Orleans, where the suit is pending, has certified the question to this court.
 

 “There is certainly a conflict, and inasmuch as the former jurisprudence constituted a rule of property, we have concluded to overrule the Rice Case, without stopping to debate whether its doctrine is not the logical deduction from the provisions of the Code on the subject of registry. ‘Omnis innovatio plus novitate perturbat quam ultilitate prodest.’ Levy v. Hitsche, 40 La.Ann. [500] 508, 4 So. 472; Douglass v. Pike County, 101 U.S. 677, 25 L. Ed. 968.
 

 “We therefore answer the question in the affirmative.”
 

 See, also, Tulane Law Review, Vol. VII, No. 1, 117 et seq.
 

 We shall now proceed to analyze the jurisprudence with reference to the case of State v. Erwin, supra.
 

 Learned counsel for both parties litigant stated that the main point in the case is the correctness or incorrectness of the decision in State v. Erwin, supra, and whether or not it should be followed or overruled. They also agree that the facts in this case are so substantially similar to those in the Erwin Case that this case must be decided under the rule declared therein, in the event we reach the conclusion that the case of State v. Erwin is correct.
 

 There the State instituted an action to try title to certain lands which were submerged by the waters of Lake Calcasieu, an inland, navigable body of water. The Calcasieu river flowed through the lake and from it to the Gulf of Mexico or sea, through a channel 6 miles in length. The shores of the lake had been eroded to a considerable extent by the forces of nature —wind and wave. The State claimed the bed of the lake up to its then present shore line as belonging to it as a sovereign State, because the lake was a navigable body of water in 1812. The defendants asserted ownership of the land in question un-' der patents which conveyed title up to the shore line of the lake, as it was in 1812, when Louisiana was admitted to the Union. This court held that Calcasieu Lake is a true lake, and .-that articles 509 and 510 of the Revised Civil Code, covering alluvion, dereliction, and reliction had no application to the case, and that the submerge'd lands belonged to the riparian owners. On rehearing, the court held that the lake was not an arm of the sea and reiterated its previous views.
 

 In the original opinion, the case of New Orleans Land Co. v. Board of Levee Commissioners of Orleans Levee District, 171 La. 718, 132 So. 121, was expressly overruled, but the court never attempted to explain the authorities upon which it was predicated.
 

 Three of the justices dissented on the ground that Calcasieu Lake, even though it was an inland fresh water lake, was nevertheless a navigable lake, and therefore title to the bed thereof vested in the State under its inherent sovereign rights, and that it was against public policy for such lands to be privately owned, being a public thing.
 

 
 *805
 
 Articles 450 and 453 of the Revised Civil Code read as follows:
 

 “450.
 
 Common things defined.
 
 — Things, which are common, are those the ownership of which belongs to nobody in particular, and which all men may freely use, conformably with the use for which nature has intended them; such as air, running water, the sea and its shores.”
 

 “453.
 
 Public things defined.
 
 — Use.— Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water.
 

 “Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads and harbors.”
 

 In the case of State v. Bayou Johnson Oyster Co., 130 La. 604, 610, 58 So. 405, 407, in which it was held that the beds of all navigable bodies of water, including lakes, belong to the State, the court said:
 

 “The jurisprudence of the country is now settled to the effect that, upon the acquisition of territory by the United States, whether by cession from one of the states, by treaty with a foreign country, or by discovery and settlement, the title to, and control of, all the tide lands became vested in the government ‘for the benefit of the whole people, and in trust for the several states, to be ultimately created out of the territory’; * * * that the states admitted into the Union since the adoption of the Constitution became at once entitled to the soil under their navigable waters, the same as the original states, and that nothing therein remained to the United States save the public lands, which do not include lands below high-water mark; * * * that ‘the soil beneath the Great Lakes and navigable waters, above as well as below the flow of the tide, properly belongs to the states, by their inherent sovereignty, and* the United States has wisely abstained from extending (if it could extend) its surveys and grants beyond the limits of high water’; that the titles and rights of riparian or littoral proprietors in the soil below high-water mark are governed by the laws of the several states, subject to the rights granted to the United States by the Constitution.”
 

 In the case of State v. Capdeville, 146 La. 94, 106, 83 So. 421, 425, the court said:
 

 “However, the beds of navigable streams, lakes, etc., never belonged to the United States, but are the property of the states in virtue of their inherent sovereignty. * * * Therefore, once a body of water is found to be navigable, it follows that the bed or bottom must be held to be the property of the state.”
 

 Since it is conceded that Grand Lake is a navigable body of water, and the law is settled that the title to the bed of such a body of water is vested in the State, the question arises whether the eroded or disputed area, which has been added to the bed of the lake by the combined forces of nature — subsidence and erosion — has so become a part of the bed of the lake, that it is now the property of
 
 *807
 
 the State, and the riparian proprietors have lost their title. It appears to be the rule that where the forces of nature — subsidence and erosion — have operated on the banks of a navigable body of water, regardless of whether it be a body of fresh water or the sea, or an arm of the sea, the submerged area becomes a portion of the bed and is insusceptible of private ownership. This is of necessity the law, because, to hold otherwise would be contrary to sound principles and public policy upon which the rule is predicated. It is the rule of property and of title in this State, and also a rule of public policy that the State, as a sovereignty, holds title to the beds of navigable bodies of water.
 

 In the case of State v. Richardson, 140 La. 329, 349, 72 So. 984, 991, where the title of riparian lands was considered, the court citing article 453 of the Civil Code, declared that:
 

 “The state of Louisiana, in virtue of her sovereignty, became the owner of all lands underlying the navigable waters within her territory, below mean high-water mark, with power to determine the rights of riparian proprietors with respect thereto, subject only to the limitations imposed by, and under, the Constitution of the United States; and, in the exercise of that power, she has enacted laws which have been read into the titles of all lands bordering upon such waters and which declare, in effect, that the property of the beds of navigable streams is in the public, so long as they are covered with water.”
 

 This principle was also recognized and the above case cited with approval in the case of Wemple v. Eastham, 150 La. 247, 90 So. 637.
 

 In Barney v. City of Keokuk, 94 U.S. 324, 337, 338, 24 L.Ed. 224, 228, while the court reluctantly recognized the title embracing the bottom of a navigable stream, it pointed out that such a title was contrary to public policy, saying:
 

 “By the common law, as before remarked, such additions to the land on navigable waters belong to the crown; but as the only waters recognized in England as .navigable were tide-waters, the rule was often expressed as applicable to tidewaters only, although the reason of the rule would equally apply to navigable waters above the flow of the tide; that reason being, that' the public authorities ought to have entire control of the great passageways of commerce and navigation, to be exercised for the public advantage and convenience. The confusion of navigable with tide water, found in the monuments .of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British island and that of the American continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many States of doctrines with regard to the ownership of the soil in navigable waters above tide water at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for .the several States themselves to determine.
 
 *809
 
 If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections.”
 

 The mere fact that a portion of the bed of a navigable body of water may have been formed by the action of natural forces does not change the situation, for the rule is, that when submersion occurs, the submerged portion becomes a part of the bed or bottom of the navigable body of water in fact, and therefore the property of the State, by virtue of its inherent sovereignty, as a matter of law. If this were not so, there could be a complete rim of privately owned submerged lands around the entire circumference of a navigable lake. This is wholly undesirable and destructive of progress, because it would practically deprive the public of the use of the lake under State laws. To say that the federal government could regulate the use, by the public, of such navigable bodies of water under the commerce clause and its admiralty jurisdiction, is not a satisfactory reply.
 

 The first case in Louisiana on this question is Milne v. Girodeau, 12 La. 324. The record in that case discloses that the plaintiff, through mesne conveyances originating from a French grant in 1764, was the owner of a large piece of property on the shores of Lake Pontchartrain. At the time the grant was made, the land extended farther into Lake Pontchartrain than at the time the suit was filed. The plaintiff, as riparian owner, in 1831 had a plat made of the property, laying it out as a townsite or village. The streets and squares shown thereon extended to the water’s edge and some of the lots and squares were shown on the plat as extending into the bed of the lake to the point of the original line of property at the time of its acquisition from the French government. Plaintiff sold a number of lots in 1833. The defendant erected a house upon one of the lots, which was inundated. Upon refusing to yield to the plaintiff’s demand that he move, plaintiff instituted a petitory action claiming to be the owner of the submerged lot, and asking that the defendant be ousted therefrom and enjoined from further interfering with his possession. The defense was that the property formed a part of the bed of the lake and was common property and therefore insusceptible of private ownership. The district-judge sustained the defense, rejecting the plaintiff’s demand, and he appealed. In affirming the judgment, this court said:
 

 “It appears to us that the testimony shows fully, the ground in question, lies much below high water mark, and forms part of the bed of the lake, and is not, therefore, susceptible of private ownership.”
 

 In the case of Roussel v. Grant, 14 Orleans App. 57, the plaintiff sought to recover from the defendant a tract of land bordering on Lake Pontchartrain, predicating his title upon a complete Spanish grant. The defendant claimed under a grant from the Secretary of War and pleaded that the plaintiff was seeking to recover a part of the bed of Lake Pontchartrain. The court said:
 

 “It is matter of public knowledge that the waters of Lake Pontchartrain have constantly gained upon the shore at this point,
 
 *811
 
 during the last one hundred and fifty years. And doubtless the grant to plaintiff’s ancestor contained more land than is found there at present.
 

 “But
 
 since land below the low water mark is not susceptible of private ownership, it is purely a moot question, and of no practical importance for us to inquire whether or not plaintiff’s lots once extended beyond the present shore line. Plaintiff is clearly entitled to all the land up to the present low water mark; and if the actual measurement now given extends beyond the old low water mark plaintiff takes nothing by this judgment beyond that mark.”
 

 The question was squarely presented and answered by this court in the case of New Orleans Land Co. v. Board of Levee Commissioners of Orleans Levee District (1930) 171 La. 718, 132 So. 121, 122. In that case the plaintiff sued to recover the value of 39.43 acres of ¡and, 28.2 of which the court found lay below the high-water mark. The court said:
 

 “There is no doubt that the shore line of plaintiff’s property originally extended a considerable distance north of Adams avenue. But there is also no doubt that, as a result of the erosive action of the waters, the greater portion of the land at the time' it was appropriated by the defendant had become a part of the bottom of the lake.
 

 “In determining the issues involved in this case, it is of no practical value to ascertain whether Lake Pontchartrain should be classed as a salt-water tidal lake or a fresh-water inland navigable lake. The legal situation with which we are concerned here is the same in either case. The water bottoms of both classes of lakes are owned by the state to the high-water mark. McGilvra v. Ross, 215 U.S. [70] 77, 30 S.Ct. 27, 54 L.Ed. 95; Barney v. Keokuk, 94 U.S. 324, 24 L.Ed. 224; Civ. Code art. 451; Milne v. Girodeau, 12 La. 324; State v. Bozeman, 156 La. 635, 101 So. 4; Bruning v. City of New Orleans, 165 La. 511, 115 So. 733. * * *
 

 “The record also satisfies us that 28.2 of the 39.43 acres claimed by plaintiff lie below this ordinary high-water mark, and, hence, is a part of the lake bottom and insusceptible to private ownership.”
 

 Now, there is no doubt that the foregoing authorities announce a rule of law which has been in effect in this State since May, 1838. The decision in State v. Erwin expressly overruled the last case on that question and, impliedly, set aside the previous authorities, although those decisions were rendered by unanimous courts. We are fortified in our conclusion that the ruling in the case of State v. Erwin is contrary to the previous and well-established jurisprudence by the exhaustive dissenting opinion and the authorities therein cited, and the able opinion of the learned trial judge, who refused to follow that case.
 

 In the Tulane Law Review, Vol. VII, No. 3, p. 438, dated April, 1933, the author of a well-written article on this subject, after discussing the authorities of both the common and civil law, including our own decisions, concluded by saying: “The instant case (State v. Erwin) sets a dangerous precedent, contrary to the whole spirit of the Code which forbids private ownership of the beds of riavigable waters.” Citing arti
 
 *813
 
 cíes 450, 453, 455, 512, and 518 of the Louisiana Civil Code. “ * * * The Calcasieu Lake case or State v. Erwin seems therefore, to he entirely out of line with the rest of Louisiana jurisprudence on the subject of lakes, and since it is clearly bad policy to allow private ownership of the beds of navigable waters of any kind, it is submitted that the conclusion of that case will produce undesirable results.”
 

 See, also, Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872, 878; East Omaha Land Co. v. Jeffries (C. C.) 40 F. 386, 392; Hume v. Rogue River Packing Company, 51 Or. 237, 83 P. 391, 92 P. 1065, 96 P. 865, 31 L.R.A.(N.S.) 396, 131 Am.St.Rep. 732; Trustees of Town of East Hampton v. Kirk, 84 N.Y. 215, 38 Am.Rep. 505.
 

 Counsel for the plaintiff has referred us to the following cases, in support of State v. Erwin:
 

 (1) Zeller v. Southern Yacht Club, 34 La.Ann. 837; (2) Sapp v. Frazier, 51 La. Ann. 1718-1725, 26 So. 378, 72 Am.St.Rep. 493; (3) Slattery v. Arkansas Natural Gas Co., 138 La. 793, 805, 70 So. 806.
 

 The first case was decided in 1882 and held that “the ‘batture, accession or accretion’ ” built upon the shore of the lake was public property and not susceptible of private ownership. The court said:
 

 “The plaintiff, however, denies that Lake Pontchartrain is either the sea or an arm -of the sea, and, therefore, contends that this question of accretions or alluvion on the sea shores has no applicability to this case. It might be a sufficient reply to this, to say, that the only acknowledged right to accretions as property under our law, are those formed on rivers and running streams; and that there is no recognition of any property right therein, when formed on lakes, bays, arms of the sea, or other large bodies of water and that the modes or ways of the acquisition or property are limited to those expressly prescribed by' law and cannot be extended by implication. But we consider this question virtually disposed of in the case of Milne v. Girodeau, 12 La. 324.”
 

 This statement is decidedly favorable to the State’s position here, for it will be observed that the court places lakes in the same category as “arms of the sea, * * * bays, * * * or other large bodies of water.”
 

 It was also said, in connection with the point raised by the exception to the plaintiff’s petition, that Lake Pontchartrain is an arm of the sea, and hence the laws of alluvion and dereliction do not apply.
 

 The court further said that articles 509 and 510 concerning alluvion and dereliction do not apply to lakes.
 

 In the second case, the plaintiff’s lands bordered on Lake Bistineau, which was a very wide body of water in the winter, but shrunk to a small stream in the summer, leaving a large tract of fertile pasture land. The plaintiff claimed riparian rights therein, but this court held that
 
 reliction,
 
 in the true sense of the word, had not taken place and that the plaintiff had no title to the land left dry during the summer months.
 

 This case was followed by others establishing the rule that the bed of a navi
 
 *815
 
 gable lake extends to the high-water mark. State v. Bozeman, 156 La. 635, 101 So. 4; State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405; Louisiana Nav. Co. v. Oyster Commission of Louisiana, 125 La. 740, 51 So. 706, and State v. Capdeville, 146 La. 94, 83 So. 421.
 

 In the third case, a great raft or barrier in the Red river caused certain lakes to form. The barrier was removed by the government and the lakes were partially or wholly drained. The riparian owners of the former shores claimed title to the land left dry, under article 510 of the Civil Code. The court held that, in order for this rule to apply, the dereliction must be gradual and imperceptible, and that, as the dereliction was brought about suddenly and over a large area by the artificial work of man, plaintiff was not entitled to recover.
 

 The same conclusion was reached in the case of Bank of Coushatta v. Yarborough, 139 La. 510, 71 So. 784.
 

 Practically the same result was reached in Bruning v. City of New Orleans, 165 La. 511, 115 So. 733, where it was held that lands reclaimed by artificial process with public money do not constitute batture so as to give their title to the riparian landowners.
 

 Therefore, it may be seen that these authorities can be differentiated from the decision in the case of State v. Erwin. If it be said that they cannot be distinguished and that they support the ruling in the case of State v. Erwin, then, it appears to us that the court in its desire to support the strong and sound principles of public policy supporting the rule that the beds of navigable bodies of water belong to the • sovereign State, has excluded the riparian proprietor from the accretion or the dereliction claimed, on the theory that these lands foi'med by the recession of such public navigable bodies of water are insusceptible of private ownership, being a public thing, and that they belong to the sovereign State.
 

 The author of the majority opinion in State v. Erwin was apparently endeavoring to give application to the maxim of Roman Law “Qui sentit onus, sentiré debet et commondum,” the equitable principle underlying the rule of title to alluvion and dereliction in the Civil Law system — referred to in the case of Delachaise v. Maginnis, 44 La.Ann. 1043-1048, 11 So. 715. He must have discerned by reading the decisions of this court that where a riparian owner was claiming alluvion and dereliction which took place along the shores of a navigable lake, he was denied title to this land; whereas, when the State claimed an eroded area along the shore of a navigable- lake, the court recognized the State’s title to the property, a public thing, as a result of its inherent sovereignty. This must have im-' pressed the court as being inequitable and therefore the reason for overruling the case, i. e., New Orleans Land Co. v. Board of Commissioners, etc., supra., which recognized the State’s title to the eroded area. It appears that the purpose was to make the law equitable — neither the State nor the riparian owner gaining or losing when the water line of the lake expanded .or contracted. The majority opinion accomplished this result by stating articles 509 and 510 of the Civil Code with reference to alluvion and dereliction did not apply to fresh water,
 
 *817
 
 navigable lakes. But, in order to reach this conclusion, the court had to go counter to the long-established sound principles of public policy in our jurisprudence — that the title to the bottoms of navigable bodies of water belong to the State as a result of its inherent sovereignty and are insusceptible of private ownership.
 

 Consequently, the effect of the decision was more harmful and destructive of the rule of property and public welfare than the correction of an alleged inequitable situation in the jurisprudence or law.
 

 The majority view on rehearing in the State v. Erwin Case sought to explain the authorities cited in support of the dissenting opinion, simply on the ground that they had no "application, because Lake Pontchartrain was an arm of the sea, and therefore within the exception provided for in article 510. This article reads as follows:
 

 “The same rule applies to derelictions formed by
 
 running water retiring
 
 imperceptibly from one of its shores and encroaching on the other; the owner of the land, adjoining the shore wfiich is left dry, has a right to the dereliction, nor can the owner of the opposite shore, claim the land which he has lost.
 

 “This right does not take place in case of derelictions of the sea.”
 
 (Italics ours.)
 

 It will be noted that the word “sea” is used. Therefore, to say that this same rule applies to derelictions formed on the shores of an “arm of the sea” is extending the rule and applying it by analogy. The practical result of this extension was to apply the rule several times to
 
 Lake
 
 Pontchartrain.
 

 It is to be noted that, in the decisions of this court dealing with Lake Pontchartrain, there is no description of the lake and no definition of the phrase “arm of the sea.” In State v. Erwin, it is said that Lake Pontchartrain has been held to be “an arm of the sea.” In the same opinion, the court also states that Lake Calcasieu is not “an arm of the sea.” However, both lakes empty into the Gulf of Mexico and Lake Calcasieu is closer and more directly connected with the Gulf then Lake Pontchartrain, as clearly appears from the map filed in evidence herein. No explanation is made why one lake is held to be “an arm of the sea” and the other lake held
 
 not
 
 to be “an arm of the sea.” Certainly this phrase should have some definite meaning and its explanation should not be left to the discretion of the court in a particular case, in order that the jurisprudence and the law may be uniform and effective.
 

 It is said that State v. Erwin merely reiterated the rule established in the early jurisprudence in the cases of Milne v. Girodeau and Zeller v. Southern Yacht Club, supra, to. the effect that articles 509 and 510 of the Revised Civil Code, dealing with accretion and dereliction, did not apply to navigable lakes. On the other hand, it is said that those two early cases are to be distinguished from the Erwin Case on the ground that Lake Pontchartrain, which was there involved, was “an arm of the sea,” and under the express provisions of article 510, Rev.Civ.Code, accretion and dereliction do not apply to the seashore. If Lake Pontchartrain were held by these early decisions to be “an arm of the sea,” that was a sufficient and1 complete answer
 
 *819
 
 to the claim of the riparian owner to accretion and dereliction, and it was unnecessary for the court to say that articles 509 and 510 of the Revised Civil Code had no application to a lake, unless the court meant to treat a
 
 lake
 
 as “an arm of the sea.”
 

 Furthermore, no explanation is made of the language of one of the cases cited, i. e., Zeller
 
 v.
 
 Southern Yacht Club, supra, and hereinabove quoted, where the court classified
 
 lakes
 
 with bays and arms of the sea.
 

 Finally, there is no explanation— not even a word in the opinion in support of the expression that it is a “better view” to hold that the lake bottom or bed is susceptible of private ownership, than to hold, as was stated in New Orleans Land Co. v. Board of Levee Commissioners, 171 La. 718, 722, 723, 132 So. 121, 123, that:
 

 “In determining the issues involved' in this case, it is of no practical value to ascertain whether Lake Pontchartrain should be classed as a salt-water-tidal lake or a fresh-water inland navigable lake. The legal situation with-which we are concerned here is the same in either case. The water bottoms of both classes of lakes are owned by the state to the high-water mark. McGilvra v. Ross, 215 U.S. [70] 77, 30 S.Ct. 27, 54 L.Ed. 95; Barney v. Keokuk, 94 U.S. 324, 24 L.Ed. 224; Civ. Code, art. 451; Milne v. Girodeau, 12 La. 324; State v. Bozeman, 156 La. 635, 101 So. 4; Bruning v. City of New Orleans, 165 La. 511, 115 So. 733.”
 

 We believe that reasons of public policy readily suggest themselves why the above-quoted expression of the law is correct.
 

 It is our opinion that the doctrine of stare decisis, as establishing a rule of property, is not applicable in the instant case, and that the case of State v. Erwin, supra, is erroneous and is hereby overruled. We are further of the opinion that the bed or bottom of Grand Lake, a navigable body of water, including the area in controversy, which has been submerged since 1883, belongs to the State of Louisiana, by virtue of its sovereignty, it being a public thing and insusceptible of private ownership under the provisions of articles 450 and 453 of the Revised Civil Code. Having reached the above conclusion, it is unnecessary to consider the applicability of articles 509 and 510 of the Revised Civil Code to this case.
 

 It is contended that, as the rule in the Erwin Case has become a rule of property, for this court to overrule that decision and annul that principle, would deprive plaintiff of its property without due process of law. The plaintiff purchased its property by mesne conveyance in 1917. At that time, the decision in the case of State v. Erwin was not in existence, because it was rendered in 1931. Plaintiff, therefore, bought its property with the rule of law established distinctly against its right to the title to an eroded area along the lake shore and with the law clearly establishing title to such land in the State. State v. Richardson, 140 La. 329, 72 So. 984. Therefore, the rights of the sovereign State to the ownership of the beds of navigable waters must be read
 
 *821
 
 into the titles of those who own lands bordering on such waters. The last contention of plaintiff is without merit.
 

 For the reasons assigned, the judgment appealed from is affirmed, at appellant’s costs.
 

 ODOM, J., dissenting.