LOTTINGER, Judge
(dissenting).
This suit originated as a possessory or jactitory action instituted by the State of Louisiana, the State Mineral Board, Sinclair Oil and Gas Company, Sohio Petroleum Company, Peoples Production Company, El Paso Natural Gas Company, and Western Natural Gas Company, who filed the petition wherein they alleged that the State of Louisiana was the owner of certain property described therein, that Sinclair Oil and Gas Company and the other plaintiffs were mineral lessees of the property by virtue of a State lease executed on April 15, 1954 by the State Mineral Board in favor of those lessees. They alleged that they were in actual physical possession of the property and had been in such possession for a period of more than one year by virtue of mineral development and production from the tract under the terms of their lease from the State of Louisiana and’ the State Mineral Board. The petition then went on to allege that the defendant, Al-bín P. Scott,, had slandered and was continuing to slander the title of the petitioners-to a portion of the property by claiming to own an area of 1321.26 acres which the petitioners alleged lay partly within the bounds of the property described in the petition. The petition described the property claimed by Scott as follows, to-wit:
“Lots 2 and 3, Section 15, all of Tract sections 7, 8, 17 and (Sea Marsh) Section No. 18, Township No. 24 S, Range No. 21 E in the S.E. west of River Land District, containing 1321.26 acres, according to the official plat of survey of said land in State Land Office, situated in the Parishes of Lafourche and/or Ter-rebonne, State of Louisiana.”
The petition further alleged that the property claimed by Scott lying within the tract owned by the State of Louisiana and leased to Sinclair Oil and Gas Company, et al, had subsided beneath the waters of the Gulf of Mexico. The slander complained of in-the petition was that Scott had on June 15, 1954, caused to be recorded in the Conveyance Records of the Parishes of Lafourche and Terrebonne, an act of sale from Jules N. Lapene, et al, to him (Scott) which act of sale purported to convey title to the tract hereinabove described; it being alleged however, that said act could not have the legal effect of transferring title because of the fact that the land had subsided and had become by erosion a part of the bed of the Gulf of Mexico and therefore was no longer privately owned. The petition prayed for judgment decreeing that Scott was slandering petitioners’ title to the property and for judgment recognizing petitioners’ possession as owners of the property claimed by-Scott, unless the defendant would within a *887 reasonable delay institute an action for maintenance of any claims or purported rights in the property.
According to the petition of plaintiffs, the area leased to Sinclair Oil and Gas Company, et al by the State of Louisiana, comprised land other than that claimed by Scott, and in order to more fully identify and locate the State lease and the land allegedly claimed by Scott, petitioners annexed to their petition a plat purporting -to show the limits of both State Lease No. 2490 and the Scott claim.
The defendant, Scott, filed a series of peremptory and declinatory exceptions to the petition, all of which were overruled by the Trial Court. Thereafter, Scott filed an answer admitting that the State had purportedly granted a mineral lease as described in its petition, but he denied the validity of the lease and the authority of the State to grant same. Scott likewise admitted in his answer that he recorded the act of sale to him of the property described ;in the plaintiff’s petition, and denied all other allegations of that petition. Scott then went on to answer a supplemental and amended petition which had been filed by the plaintiffs prior to Scott’s answer and admitted plaintiffs’ allegation contained in the supplemental and amended petition to the effect that the property in dispute was in fact located in the Parish of Lafourche. Pleading alternatively, in the event that plaintiffs were able to prove that they had the requisite possession necessary to maintain the action of slander of title, Scott alleged that he would, within the time allowed by the Court, bring a petitory action in revendication of his title.
Thereafter plaintiffs hereinafter referred to simply as “State”, filed a petition for a rule to show cause why judgment should not be rendered on the face of the pleadings, and after a trial on that rule there was judgment rendered by the Trial Court making the rule absolute and granting to Scott 60 days from the date of judgment “to assert such right as he claims to have against or in the property involved in this action or to disclaim any title whatsoever forever”. This judgment was rendered, read and signed on December 1, 1958, and on January 29, 1959, in the same proceeding as the jactitory action, Scott instituted a petitory action wherein he alleged that he was the owner of the identical property described by the State in its petition, that he had purchased the land from Jules N. Lapene, et al, and went on to deraign a chain of title, which chain of title originated with the issuance of patent No. 5242 of the State of Louisiana, signed by the Governor and the Registrar on June 7, 1883 and issued to Jules Lapene, an ancestor of Scott’s vendor.
The State answered the petitory action and denied all of the material allegations of Scott’s petition, reaffirmed its ownership of the property described in their petition, which in substance described the area comprised within the entirety of State Lease No. 2490, asserted that it was and had been at all pertinent times in possession of the property involved in the dispute and further alleged that the claims of Scott covered claims to waterbottoms; and in addition the lands had subsided beneath the waters of the Gulf of Mexico, and further that said land had become, by erosion, a part of the bed of the Gulf of Mexico and therefore was insusceptible of private ownership.
The matter was taken up and tried on February 17, 1960, at which time Scott introduced into evidence the patent and certificate of the Register, State Land Office, together with a judgment of the Civil District Court for the Parish of Orleans, in the Succession of Jules Lapene, and the opinion'of the Supreme Court in the same succession proceedings. Scott also introduced the act of sale from Jules Lapene et al to Albín P. Scott, and thereafter rested his case.
There were several stipulations entered into between counsel for Scott and counsel for the State, one of which dealt with a survey made by Mr. Aubrey Burke, an en *888 gineer who surveyed the property in question for the State of Louisiana and for Sinclair. This stipulation related to Mr. Burke’s qualification as a licensed state land surveyor, his professional education, professional career, etc. It dealt with his method of having made the survey, the sources employed by him in connection with the making thereof, and in general, the procedure which he employed in collating all of his information.
On that same date there was some testimony elicited by the State from a Mr. Fredericks, who was a land man for Sinclair and who testified that he had accompanied Mr. Burke in making soundings of the northern line of State Lease No. 2490. He testified relative to the completion date of the well which was drilled on State Lease No. 2490 that the well itself was well out in the water and that there was no land seaward of the drilling platform. The State introduced several exhibits in connection with the stipulation relative to Mr. Burke’s survey and in connection with Mr. Fredericks’ testimony, and there rested its case subject to the right of Scott to cross-examine Mr. Burke if he desired.
Thereafter, on August 16, 1960, the attorneys for Scott and all defendants in the petitory action entered into a stipulation wherein it was agreed that counsel for Scott did not wish to cross-examine Mr. Burke and that the taking of testimony was closed. The parties further stipulated that at that time “that the area in litigation had been washed away or had subsided and had been covered by water for more than 6 years before the present suit was filed * *
While the Trial Judge still had the matter under advisement and on March 3, 1961, Scott filed a motion to reopen the evidence, alleging that at the time of the trial on February 17, 1960, there were two maps attached to the stipulation which was entered into, one of which was a reference map prepared by John LaTourette, showing Tim-balicr Island as surveyed by G. F. Connely, and another map made by T. S. Hardee in 1871. He then set out that the stipulation was entered into under the belief that those maps represented the situation and condition of the land in question at their respective dates of making, and that no other maps or evidence was available. He alleged that other maps had since become available to him which caused him to believe that the LaTourette map and the Hardee map did not correctly represent the situation and condition of the land in question. This motion recited that the situation and condition of the property which was the subject of the litigation after the time of the issuance of the patent by the State to Lapene was an issue of fact of crucial importance in the case in that the Court’s decision must rest substantially on a determination of when the lands involved became completely submerged in the waters of the Gulf of Mexico.
On November 27, 1962, Scott filed an “Exception of prescription or peremption” wherein he again alleged his ownership of the property described in his petition, set forth his acquisition and chain of title to-that property and further showed that the State had failed to bring any action to annul the Lapene patent for a period in excess of six years from the date of issuance of the patent and that consequently, any claim or suit to annul the transfer by the State for any reason whatsoever was barred by the provisions of Act No. 62 of 1912 (R.S. 9:5661). At the same time, Scott also filed a plea of unconstitutionality wherein he set forth that if Act 727 of 1954 (R.S. 9:1107, et seq.) be relied upon by the State as a defense to any of the claims of Scott, then Scott specifically pleaded and urged that construction of the Act as contended by the State would render the act unconstitutional. On January 24, 1963, the State filed a special plea of estoppel wherein it alleged that the evidence in the matter showed the land patented not to have been considered part of the Gulf of Mexico and that Scott was estopped from denying the recital and the effect of the patent upon which he relied for his *889 title, that no evidence varying the terms of the patent should be admitted, and that the parties had previously stipulated regarding the condition of the land which is the subject matter of the case and that Scott was estopped from denying or varying any facts set forth in stipulation.
On November 27, 1962, the date on which these exceptions and pleas were filed, the rule to show cause issued in connection with the motion to reopen the evidence was argued and presumably made absolute, as several items of evidence were introduced.
Scott introduced an overlay map which had been made from a map of 1842 based upon the survey of 1837, and several other maps. After the introduction of the various exhibits, it was agreed by the parties that depositions of expert witnesses would be taken by both parties at a later time, which depositions would be submitted to the Court. These depositions were in fact taken by agreement and filed in the record.
On February 3, 1965, with written reasons for judgment, the District Court granted judgment in favor of the State of Louisiana, et al, and against the defendants, dismissing the petitory action at defendant’s cost and further decreed that ownership and title to the land in question was vested in the State of Louisiana.
In his written reasons for judgment, the Trial Judge found that the property in question was, at the time of the suit, under water and a part of the Gulf of Mexico, mentioning the stipulation of counsel to the effect that the area in litigation had been washed away or had subsided and had been covered by water for more than 6 years before the instant suit had been filed. He discounted the plea of prescription filed by Scott on the basis of Act 62 of 1912, stating in his opinion that the six year prescription was not applicable. The primary basis for the Trial Court’s judgment appears to’be that in its opinion, the record fails to disclose that there was a sale of any bed of any navigable body of water, and it therefore followed, in his opinion, that the case revolved around the question of determining what happens to the ownership of the coastline when it becomes a part of the sea itself. The Trial Judge, based upon his appreciation of the record, went on to apply the case of the Miami Corporation v. State, 186 La. 784, 173 So. 315, and in so applying that case, found that the patent to Jules Lapene patented only land, and that as what had been patented was now admittedly waterbottom, that the land patented to Lapene must have subsided subsequent to its having been patented.
Scott timely appealed the judgment of the Trial Court to this Court.
In his brief, Scott ttrges two specifications of error, which are as follows:
1. The Lower court erred in holding that this cause is not governed by the decision of the Louisiana Supreme Court in California Company v. Price, 225 La. 706, 74 So.2d 1 (1954).
2. In the event this Court determines that no error was committed in refusing to apply California Company v. Price, supra, the lower court nevertheless erred in its application of Miami Corporation v. State, supra.
Before going into the merits of the specification of error assigned by Scott, we observe that this case originated in the form of a jactitory or slander of title branch of the possessory action instituted by the State wherein they alleged sufficient possession to maintain a possessory action, and that their title to the land was being slandered by the recordation and continued existence of Scott’s sale. The State obtained judgment against Scott in the jactitory action, and the judgment contained the normal reservation in favor of a nonsuccessful defendant in a possessory action granting to him the right to establish his title within a delay fixed by the Court.
Pursuant to that judgment, and within the time allowed, Scott instituted a petitory action wherein he pleaded his title, and at the trial of the matter on the merits, did in *890 fact deraign his chain of title which originated with the issuance of the patent to Jules Lapene in 1883. The State introduced no record title which in any way conflicted with the Scott title per se, but urged as a matter of defense that the property patented to Lapene in 1883 was at that time land which, subsequent to 1883, subsided beneath the waters of the Gulf of Mexico, and then went on to set forth the law contained in the Civil Code and as further enunciated in the Miami case, supra, to the effect that the ownership of all lands which subside beneath the waters of navigable bodies of water becomes vested in the State.
The record shows, and counsel for the State sets forth in his brief, that at the time of the issuance of the Lapene patent in 1883 there were only three maps of the Timbalier Island area on file in the State Land Office. These were the G. F. Con-nely survey of 1837, the John LaTourette map of 1853 and the T. S. Hardee map of 1871. The LaTourette map and the Hardee map are area maps which delineate a large portion of southeastern Louisiana and the southeastern Louisiana coast and do not purport to show the location of any sections or lots on Timbalier Island, the scale of these maps obviously being such that accurate depiction of sections and/or lots would be an impossibility considering the relatively small amount of space consumed by the depiction of Timbalier Island itself. The Connely survey of 1837 which, together with Connely’s field notes, are in the record, is a United States Government survey and does in fact purport to show the portion of Timbalier Island with which we are concerned, as well as the location and area of the various lots and sections with which we are concerned.
We believe that it is quite clear that at the time that the State granted the patent in question to Jules Lapene in 1883, the State was vested with the power and authority to patent to Lapene, land of any character whatsoever whether it be high land, land subject to tidal overflow, sea marsh, or waterbottom. The prohibition against State alienation of waterbottoms as contained in the State Constitution of 1921 Art. 4, Sec. 2, had not yet come into being. We believe it also clear and admitted by all parties at interest that the State of Louisiana at no time urged the invalidity of the Lapene patent on the basis of Act No. 62 of 1912, which the Louisiana Supreme Court has repeatedly defined as a statute of repose. In fact, the State strenuously contends that it makes no attack whatsoever on the validity per se of the Lapene patent. Therefore, as the State had the right and power to patent to Lapene land of any character in 1883, and as the State did not utilize the six year period set forth in Act No. 62 of 1912 within which to urge the invalidity of the La-pene patent it necessarily follows that whatever was actually patented to Lapene in 1883 is still owned by the heirs and assigns of Lapene, no showing having been made that those persons were ever divested of title. There of course remains one way in which Lapene, his heirs and/or assigns could have been divested of title and that is if that which was patented to Lapene in 1883 was in fact land which subsequent to 1883 subsided beneath the waters of the Gulf of Mexico.
Scott has successfully pleaded and de-raigned his title to the property in question and we must now consider the State’s contention that the appellation “Sea March” contained in Lapene’s patent, delineates the property conveyed as land alone and eliminates the possibility of its being waterbot-tom. The verbatim description of the property patented in Lapene’s patent is as follows:
“Lots 2 & 3 Sec. 15. All of Fract Sec’s 7, 8, 17 and (Sea Marsh) Section No. 18, Township No. 24 S. Range No. 21E., in the S. E. west of river land District, containing 1321.26 acres, according to the official plat of the survey of said lands in the State Land Office. * * * ”
The State urges that Scott is estopped from claiming that any portion of the land patented to Lapene was anything other than Sea Marsh by reason of the fact that the *891 words “Sea Marsh” are contained in the patent. I do not believe that this plea has any merit, primarily because it was not Lapene who characterized the land as Sea Marsh, but rather the State who did so in issuing the patent. Lapene at no time signed or executed the patent, nor did he make any writen declaration or admission at the time of the issuance of the patent or thereafter that the property patented was in fact Sea Marsh only.
R.S. 41:212 provides in part:
“The public lands donated by congress to the State of Louisiana, designated as sea marsh, or prairie, and subject to tidal overflow, so as to render them unfit for actual residence, settlement and cultivation, shall be subject to entry and sale at the rate of twenty-five cents per acre.”
This act is the same as Act 75 of 1880, sec. 11, except that the previous act stated a price of twelve and one-half cents per acre, the price actually paid by Lapene at the time of the issuance of the patent. Since Lapene’s patent was issued in 1883, the price at that time was twelve and one-half cents per acre. In the Price case, supra, and State v. Cenac, 341 La. 1055, 132 So.2d 928; La.App., 132 So.2d 897, and all the other waterbottom cases, the property in question, as was this property, was entered as sea marsh at the time that it was donated by Congress. I believe that the words “Sea Marsh” in the Lapene patent are merely a notation by the Governor showing how this property was entered at the time that it was donated by Congress and as an indication of what price should be charged therefor. This, coupled with the fact that Lapene at no time admitted or agreed that the property patented him was in fact sea marsh leads me to the conclusion that the designation of the property patented to La-pene as sea marsh is merely an incidental designation or recital placed in the patent to ■determine the price to be paid for the land and to indicate how the property was entered at the time that it was donated by Congress. Having thus made a determination as to the effect of the words “Sea Marsh” contained in the patent, we are now faced with the factual situation of a plaintiff in a petitory action having pleaded and proved a valid chain of title to certain specified sections as described in a patent. As aforesaid, the only manner in which Scott can now be divested of title, is if the State successfully established that that which was patented to Lapene in 1883 was, in 1883, land which subsequent to 1883, subsided beneath the waters of the Gulf of Mexico.
I do believe that the burden of establishing subsidence must be carried by the State in the light of Scott’s successful pleading and proof of his title, particularly in the light of the fact that the State had the capability in 1883 to patent to Lapene water-bottoms as well as land. In this connection, the State argues that if the burden is placed on it to establish the subsidence subsequent to 1883 that they then will be faced with the impossible situation of proving a negative. We do not agree with this contention. I think that the proof of subsidence is rather the proof of a positive happening, viz., the fact that a specific body of land subsided beneath the waters of the Gulf of Mexico, subsequent to a given date. I do not see how this can be construed as requiring the State to prove a negative.
Let us now consider whether or not the State has successfully borne the burden of proving subsidence. During the course of the trial, the State and Scott both introduced maps, map overlays, and aerial photographs, all of which with the exception of the Connely survey, the LaTourette map and the Hardee map were made either immediately prior to or subsequent to the filing of the instant suit. The purpose and intent of the introduction of these maps and the testimony adduced in connection therewith was to attempt to establish the character and nature of the patented sections in 1883. I find all of these exhibits and the testimony adduced, which attempts to' reconstruct the configuration of Timbalier Island and the sections with which we are concerned in 1883 to be highly unconvinc *892 ing. As a matter of fact, Dr. William G. McIntyre, who testified for the State, an expert geomorphologist and who did extensive work in connection with the reconstruction of the Louisiana coastline for the State of Louisiana relative to the Tidelands problem testified as follows:
Q. “ * * * I would like to know whether in your opinion as an expert in the field, anyone can say where— what were the confines or the boundaries or limits of the Timbalier Island in 1883?
A. From my experience in studies, I— I wouldn’t — I couldn’t say where the limits would be. Now, the — I just couldn’t' — knowing that these islands, ■ — coastal areas are affected by storms, are not contiguous, even processes through time, I simply couldn’t say that I could pinpoint the boundary of 1883 or I couldn’t pinpoint. I don’t think the evidence of overlaying the 1887 map nor the 1837 map tells us where the island was in 1883.”
Dr. McIntyre was the only witness who testified in behalf of the State in an attempt to reconstruct the actual location and limits of Timbalier Island in 1883. Therefore, based upon the record, I do not believe that the State has successfully borne the burden of establishing that the patented sections were in fact land in 1883 which subsided beneath the waters of the Gulf of Mexico subsequent to 1883.
Having made this determination, it necessarily follows that I believe the Trial Judge to have been in error in his application of the case of Miami Corporation v. State, supra. As stated before, the Trial Judge, in applying the Miami case obviously did so after having made the assumption that the sections patented to Lapene in 1883 were, in 1883, in fact land. I believe that in this finding of fact, the Trial Judge was in error.
Having thus established: 1. That in 1883 the State had the capability and authority to validly patent to Lapene, land of any character, either high land or waterbot-toms; and 2. That the State admits the validity of the Lapene patent per se and it appearing from the record that the issuance of the patent was never attacked under the provisions of Act 62 of 1912 (R.S. 9:5661); and 3. That the land in question, by stipulation of counsel and by proof contained in the record was at the time of the filing of the suit, waterbottom; and 4. That Scott pleaded and proved a good chain of title to the sections hereinabove described; and 5. That the State has not proved that the sections patented to Scott were in fact land in 1883 which subsided beneath the waters of the Gulf of Mexico subsequent to 1883, I must therefore necessarily conclude that the title as made out by Scott to the subject sections is good and valid whether they now be waterbottoms or high land, by virtue of the jurisprudence established by the Louisiana Supreme Court in the cases of California Company v. Price and State v. Cenac, supra. I find that the Trial Judge was in error in applying the case of Miami Corporation v. State and in failing to apply California Company v. Price.
During the course of this proceeding in the Trial Court, on November 30, 1961, there was a petition of intervention filed by Jean Tardan, et al wherein some 24 persons alleged that they had been put into possession of and were the owners of an undivided seven-eighths interest in and to the property originally patented to Jules Lapene. By reason of its having rendered judgment in favor of the State, the Trial Court did not go into the merits of the intervention and make a determination as to the correct proportion of ownership, if any, which exist between Scott and the persons claiming to own an undivided seven-eighths interest in the subject property. Because of my dissent herein, I believe that this cause should be remanded to the Trial Court for a further determination *893 of the validity of the claim of the inter-venors in and to the subject property.
For the reasons hereinabove, assigned, I respectfully dissent from the majority herein.
LANDRY, J., concurs.
Rehearing denied.
Lottinger, J., dissents from refusal.