FOURNET, Chief Justice
(dissenting).
After carefully studying the views expressed in the majority opinion and the two dissenting opinions, as well as the several authorities therein cited, I am convinced the holding in the majority does violence to the basic and fundamental principles upon which the holding in the comparatively recent decision of Miami *747 Corporation v. State, 186 La. 784, 173 So. 315, is predicated, that is, that the title to the bottoms of navigable beds of water, and particularly those that form a part or an arm of the sea, are insusceptible of private ownership, i. e., cannot be owned by private individuals; and, therefore, the majority ruling in effect overrules the holding in the Miami case that when land bordering such streams becomes submerged under the waters thereof and, as a result, forms a part of its bed, the owner is divested of his title thereto and it thereupon becomes vested in the state for the benefit of and in trust for the people as a whole.
Viewed in the light of this public policy that is established by codal articles that have been interpreted and reaffirmed in an unbroken line of jurisprudence for more than a century — and which is also reflective of a rule that is firmly grounded in the law and jurisprudence universally obtaining in all of the states — I have no doubt that if this were an original test[1] of legislative intent in adopting Act No. 62 of 1912, the statute could, despite its all-embracive language, very easily be construed to mean that the legislature did not intend thereby to include within its purview the beds of navigable streams, and particularly those connected with or forming a part of or being an arm of the sea, but only such lands as the state would, in the ordinary course of events, have available for sale on the open market. In my opinion, such a construction is logical and sound, leading to no absurd consequences.
However, even conceding the majority is justified in giving to the act a literal interpretation, as it is here doing, the act, by its plain language, does no more than bar the state from testing, after six years, the validity of a patent within its scope, and the state’s failure to exercise this right within the prescribed time has the effect of curing the defects that might have existed in the patent, as such. Of necessity, therefore, under the holding in the Miami case, as well as all previous and subsequent jurisprudence, with the single exception of the Duck Lake case, a patent that includes within its description land that lies under arms of the sea or other navigable streams is, as to that land, nonexistent, for such land cannot be owned by private individuals and is, instead, vested in the state in trust for all the people, by virtue of its inherent sovereignty. As such, a patent to it is equivalent to a patent to air, or to the water running through the Mississippi river on its way to the sea. An arm of the sea is one of those things which *749 all men may freely use conformable -with the use for which it is intended by nature, Article 450 of the LSA-Civil Code, and is among those things that are insusceptible of private ownership. Article 482.
Clearly, if one holding under a valid patent which gives him full or perfect ownership of the land in its entirety, and, as such, entitles him to hold that property to the exclusion of all other persons, Article 488 of the LSA-Civil Code, including all that is directly above as well as beneath it, Article 505, loses his title to that part of the property that becomes submerged under navigable water, as was held in the Miami case, then one who holds under an invalid patent certainly has no greater rights merely because his invalid patent has been cured by the peremption provided by Act No. 62 of 1912.
There can be no question but that Beck-with himself was aware of this well-established public policy with respect to the beds of navigable streams, for when he took possession of the property described in his patent, he excluded the portion covered 'by the waters of the sea in placing his property on the assessment roll. I am satisfied that the California Company also took cognizance of this public policy, for it was not satisfied with a lease from the so-called Beckwith group alone, securing, in addition, a lease from the state as to that portion forming a part of the bed of Grand Bay. I am most confident, too, that but for the discovery of oil, this issue would never have been raised, as the record reveals this property was adjudicated to the state for the unpaid taxes of 1883 and that it remained in the state until cancelled some 63 years later by the Registrar of the State Land Office on the affidavit of Price, after oil development in the vicinity.
I recommended that the case be reargued to clarify the entire matter, but not having prevailed in my request, and because of the importance and far-reaching effect of this decision on the property that is inherently vested in the state in its sovereign capacity, which will create a most impossible situation that can but lead to confusion and disorder where it will be impossible to delineate the rights of an individual under full ownership and the rights of the people in general under the established public policy of the state, I respectfully dissent.

. The only decision divergent from this well established public policy is Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839, which was written as recently as January of 1953 by the author of the majority opinion on rehearing here, and is commonly referred to as the “Duck Lake Case.” But in that case there is no reference, much less consideration given, to the basic law of the state as sustained by ' our unbroken line of jurisprudence.